AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington



CERTIFIED TRUE COPY
ATTEST: WILLIAM M MCCOOL
Clerk, U.S. District Court
Western District of Washington

By _____
Deputy Clerk

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>A residence located at 10626 22nd Place South,<br>Seattle, Washington, more fully described in<br>Attachment A | )<br>)<br>)<br>)<br>)<br>) |

Case No.   **MJ20-622**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____Western_____ District of _____Washington_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Distribution/Possession w/Intent to Distribute Controlled Substances |
| 18 U.S.C. 924(c), 922(a)(6) | Possession of Firearm in Furtherance of Drug Trafficking; False Statement re: Firearm |

The application is based on these facts:

✓  See Affidavit of DEA SA Joseph Parker, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

Joseph Parker, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: _____10/01/2020_____

_____
*Judge's signature*

City and state:  _____Seattle, Washington_____

Hon. Paula L. McCandlis, United States Magistrate Judge
*Printed name and title*

USAO: 2018R01135

# AFFIDAVIT OF JOSEPH M. PARKER

STATE OF WASHINGTON  )
         )   ss
COUNTY OF KING    )

I, Joseph M. Parker, being first duly sworn on oath, depose and say:

## I. INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Drug Enforcement Administration (hereinafter "DEA"), United States Department of Justice, and have been so employed since July 2017. In that capacity, I investigate violations of the Controlled Substances Act, and related violations. I am currently assigned to the Seattle Field Division, Seattle Division Office, Enforcement Group D-22.

2. Prior to becoming a Special Agent, I worked as a Police Officer in the State of Illinois for Glendale Heights Police Department from 2013 to 2015 and for Elgin Police Department from 2015 to 2017. To become a Police Officer, I attended the Suburban Law Enforcement Academy at the College of DuPage and completed 480 hours of basic training instruction. While working as a Police Officer, I received an additional 40 hours of training in basic investigations, 40 hours of training to become certified as a gang enforcement specialist, and 40 hours of training in John Reid interviews and interrogations techniques. To become a Special Agent, I attended Basic Agent Training in Quantico, Virginia, graduating in July 2017. I have completed over 800 hours of instruction to include focus on criminal investigations, surveillance, undercover operations, drug identification, firearms, defensive tactics, legal review, and drug trafficking organizations (hereinafter "DTOs").

3. During my career, I have been involved in numerous narcotics arrests as either the primary or assisting officer/agent. I have participated in investigations involving organizations trafficking controlled substances that have resulted in arrests of drug traffickers and seizures of controlled substances. In addition, I have participated in several wire intercept investigations. Because of this experience and training, I am familiar with

AFFIDAVIT OF SA PARKER - 1
USAO #2018R01135

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

common methods of investigating drug trafficking and manufacturing organizations, and have become familiar with the methods of operation of drug traffickers and manufacturers, including, but not limited to: their methods of importing, exporting, storing, concealing, and packaging drugs; their methods of transferring and distributing drugs; their use of cellular telephones and telephone pagers; their use of numerical codes, code words, and counter surveillance; and other methods of avoiding detection by law enforcement.

4.      I am familiar with the various methods of packaging, delivering, transferring, and laundering drug proceeds.  Additionally, through training and experience, I can identify illegal drugs by sight and texture.  I am trained to use a field test kit to identify the presumptive presence of controlled substances.  I have become familiar with common slang terms and codes used by drug traffickers and their associates to refer to drugs, money, guns, vehicles, compartments, and other things related to their drug trafficking.  I have learned how they attempt to thwart law enforcement by using code terms, multiple cell phones, concealed compartments, "stash houses," and other means.  I have become familiar with the ways in which drugs commonly are transported, stored, and sold, and in what quantities and at what prices in this area, and how members of a conspiracy communicate with each other.  I am also familiar with common ways in which drug traffickers attempt to profit from their illegal activities, by hiding drug proceeds in various places to conceal the illegal source or their ownership, including hiding and transporting bulk cash, sending funds through wire transfers or bank accounts in other persons' names, or investing in assets placed in other persons' names. Throughout my law enforcement career, I have spoken with, worked with, and gained knowledge from numerous experienced federal, state, and local narcotics officers.

## II.      PURPOSE OF THIS AFFIDAVIT

5.      This Affidavit is submitted in support of an application to search the residence located at 10626 22nd Place South, Seattle, Washington (hereinafter, the "**TARGET RESIDENCE**"), as further described in Attachment A, attached hereto and incorporated by this reference as if set forth fully herein.

AFFIDAVIT OF SA PARKER - 2
USAO #2018R01135

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

6.     As set forth below, there is probable cause to believe that the **TARGET RESIDENCE** contains evidence, fruits, and instrumentalities of the following crimes: distribution and possession with intent to distribute controlled substances in violation of Title 21, United States Code, Sections 841(a)(1), possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c), and making a false statement in connection with the acquisition of a firearm, in violation of Title 18, United States Code, Section 922(a)(6), as further described in Attachment B, attached hereto and incorporated by this reference as if set forth fully herein.

7.     The information set forth in this Affidavit consists of information I have gathered and observed firsthand through the course of this investigation to date, as well as information relayed to me by other law enforcement officers, my review of law enforcement reports, and interviews of witnesses. Since this Affidavit is being submitted for the limited purpose of obtaining a search warrant, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the issuance of such warrant.

## III.     THE INVESTIGATION

**Background**

8.     This investigation is being conducted by the DEA, ATF, and King County Sheriff's Office (KCSO).  This investigation began in late 2018 when a cooperating defendant (CD2) told investigators about a Hispanic male he/she identified as Cesar CRUZ who was selling large quantities of methamphetamine and heroin.  As discussed below, investigators utilized CD2 to introduce an undercover (UC) agent to CRUZ as a new customer.

9.     At the time he/she provided information about CRUZ, CD2 had four felony convictions, including multiple crimes of dishonesty and one violent felony.  CD2 also had misdemeanor convictions for driving, theft, and firearm offenses.

10.     At the time he/she provided information about CRUZ, CD2 was cooperating with law enforcement in the hope that KCSO would not file a criminal case in which he/she

1  was arrested in possession of narcotics and a firearm.   After he/she provided this

2  information, CD2 was arrested in early 2019 and later convicted for threatening others with

3  a firearm.   Because of this incident, CD2's cooperation agreement was withdrawn, and

4  he/she was charged with, convicted of, and sentenced for the narcotics and firearm offenses

5  that had been the subject of his/her cooperation agreement.   CD2 was also convicted of a

6  previously filed burglary offense.

7       11.    During this investigation, CD2's information about CRUZ and his activities

8  was independently verified by law enforcement, as set forth herein.

9  **Information Provided by CD2**

10      12.    On September 4, 2018, ATF SA Eric D. Jackson, ATF SA Ben Hunt, KCSO

11 TFO Joseph Eshom and DEA SA Rob Brooks interviewed CD2 about CRUZ.   CD2 stated

12 he/she has known CRUZ for approximately five years.   CD2 stated CRUZ was trafficking

13 approximately 100 pounds of narcotics every two weeks or so.   CD2 stated CRUZ drove a

14 black 2018 Ford Explorer bearing Washington license plate BKH3903 to Modesto,

15 California to pick up "loads" of narcotics.   CD2 stated that CRUZ primarily picks up

16 methamphetamine, but that CRUZ also picks up heroin as well.   CD2 stated he/she knows

17 the pick-up amounts because he/she had driven to California with CRUZ on prior occasions

18 to pick up the "loads."

19      13.    CD2 advised investigators that because CRUZ did not have a criminal

20 history, he was able to lawfully purchase firearms without issues. CD2 advised that CRUZ

21 would sometimes purchase firearms for friends and criminal associates and that CRUZ

22 would also trade firearms for narcotics.

23 **CRUZ's Association with the TARGET RESIDENCE**

24      14.    Through surveillance and review of driver's licensing records and firearm

25 transaction records, investigators confirmed that CRUZ resides at the **TARGET**

26 **RESIDENCE**, and that he has identified the **TARGET RESIDENCE** as his home address

27 since 2016.

28

AFFIDAVIT OF SA PARKER - 4
USAO #2018R01135

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**Controlled Purchase of Methamphetamine from CRUZ on September 12, 2018**

15.    On September 12, 2018, TFO Eshom directed CD2 to contact CRUZ and setup an introduction to an undercover (UC) law enforcement agent, ATF SA Hunt. CD2 was also directed to advise CRUZ that SA Hunt wanted to purchase one pound of methamphetamine. CD2 stated he/she contacted CRUZ at the phone number (206) 226-4384 and set up the deal. CD2 stated CRUZ would meet with SA Hunt at the Safeway located at 138 Southwest 148th Street in Burien, Washington. CD2 stated CRUZ was going to sell one pound of methamphetamine to SA Hunt for $3,000.

16.    Prior to the deal, KCSO surveillance units set up around CRUZ's residence in Seattle (the **TARGET RESIDENCE**). Once KCSO surveillance units set up around the **TARGET RESIDENCE**, they observed CRUZ's black 2018 Ford Explorer bearing Washington license plate BKH3903 parked in the driveway.

17.    CD2 placed the phone call to CRUZ at 206-226-4384 to let him know SA Hunt was almost in the area. CRUZ texted CD2 and told CD2 that he was at the meet location and that he would be in the black truck so SA Hunt knew which car to look for. KCSO surveillance units observed CRUZ get into the driver's seat of the Ford Explorer and drive away from the **TARGET RESIDENCE**.

18.    CRUZ drove to the meet location and met with the UC in the UC's vehicle. The UC provided CRUZ with $3,000 cash and CRUZ handed the UC a gallon-size ziplock-style bag containing approximately one pound of methamphetamine. After the exchange, the UC and CRUZ discussed potential future drug transactions. The conversation inside the UC's car was recorded. CRUZ then exited the UC's vehicle, got back into the driver's seat of the black Ford Explorer, and drove away from the meet location.

19.    ATF TFO Eshom took custody of the methamphetamine and transported it to KCSO for processing. KCSO Detective Reed Jones field-tested the methamphetamine, which tested positive for methamphetamine. TFO Eshom weighed the methamphetamine at 457 grams (with packaging).

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

20.     With the information and evidence obtained from this controlled purchase of methamphetamine, ATF SA Jackson applied for, and was granted, a federally authorized warrant to affix a tracking device to CRUZ's black Ford Explorer.

21.     On September 23, 2018, investigators were able to successfully execute the tracker warrant by installing it on CRUZ's black Ford Explorer.

**CRUZ'S Trip to California in the Ford Explorer (October 12 to 14, 2018)**

22.     On October 11, 2018, CD2 advised investigators that CRUZ was planning to drive his Ford Explorer south to California on October 12, 2018 to pick up another load of narcotics.

23.     On October 12, 2018, at approximately 8:45 p.m, CD2 advised that CRUZ had left for California around 7:45 p.m. that same evening.  Investigators corroborated this information as the GPS tracker indicated that the black Ford Explorer began traveling southbound on Interstate 5 near Route 516 that same day at approximately 8:04 p.m.  The GPS tracker indicated that the black Ford Explorer maintained a constant southbound route on Interstate 5 with intermittent stops at various rest areas throughout the night of October 12, 2018 and into the day of October 13, 2018.

24.     On October 13, 2018, at approximately 3:36 p.m., the Ford Explorer stopped in the area of 10907 Weaver Avenue in South El Monte, California.  The Ford Explorer stayed within that area for almost four hours.  Prior to this stop, the Ford Explorer had only made brief stops no longer than 10 to 20 minutes in length, while en route to South El Monte, California.

25.     At approximately 7:16 p.m., the Ford Explorer left the area of 10907 Weaver Avenue, South El Monte, California, and began travelling west on Interstate 10.  Shortly after, the Ford Explorer began traveling north on Interstate 5.

26.     The GPS tracker indicated the Ford Explorer maintained a constant northbound route on Interstate 5, with intermittent stops at various rest areas throughout the night of October 13, 2018 and into the day of October 14, 2018.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

27.     On October 14, 2018, at approximately 2:04 p.m., the Ford Explorer stopped in the area of 727 S. Donovan Street, Seattle, Washington.   Shortly after that, at approximately 2:13 p.m., the Ford Explorer returned to the **TARGET RESIDENCE**.

28.     This trip is indicative of a money drop/narcotics pick-up and bears characteristics that are typical of couriers and members of drug trafficking organizations for the following reasons:  The total distance driving from CRUZ's residence to South El Monte, California is approximately 1,140 miles, which takes an estimated 17 hours and 38 minutes to complete one-way (a grand total of over 35 hours to complete the round trip). There were limited stops that were short in duration both southbound and northbound during the entire trip.  Once the Ford Explorer arrived in South El Monte, California, it stayed there for approximately four to five hours.  After that short stay, the Ford Explorer traveled back northbound to Seattle, Washington.

29.     After the trip, CD2 advised investigators that CRUZ spoke directly to him/her.  CRUZ told CD2 that he picked up twenty kilograms of methamphetamine, five kilograms of heroin and three kilograms of cocaine.  CRUZ told CD2 that he picked up a smaller amount of narcotics on the most recent trip due to the fact CRUZ had been having some difficulty trafficking his usual amounts of methamphetamine and heroin in the greater Seattle, Washington area.  CRUZ also advised CD2 that, since he made a smaller pick-up on the most recent trip, he would have to take another trip back to California within the next few weeks to obtain more narcotics.

30.     On October 18, 2018, at approximately 12:30 p.m., investigators located the Ford Explorer parked in a public parking lot located at 19800 International Blvd, SeaTac, Washington.  Investigators deployed a trained narcotics canine to conduct a sniff of the Ford Explorer.  The canine alerted on the vehicle, indicating that he detected the odor of narcotics emitting from it.

31.     ATF SA Jackson applied for, and was granted, a second federally authorized warrant to affix a tracking device to CRUZ's black Ford Explorer.  On October 30, 2018, investigators were able to install a second GPS tracker on CRUZ's black Ford Explorer.

**CRUZ's Trip to California in the Ford Explorer (November 4 to 8, 2018)**

32.    During the days leading up to November 4, 2018, CD2 advised investigators that CRUZ was planning to meet up with some friends down in Fresno, California, that CRUZ had just purchased two firearms, and that he was planning to deliver the firearms to his friends in Fresno.

33.    On November 4, 2018, GPS tracker information indicated that the black Ford Explorer start to travel southbound toward California at approximately 7:30 p.m. Monitoring the GPS tracker and history, the Ford Explorer maintained a constant southbound route on Interstate 5 with intermittent stops at various rest areas throughout the night of November 4, 2018 and into the morning of November 5, 2018.

34.    On November 5, 2018, at approximately 8:44 a.m., the Ford Explorer stopped in the area of 1617 Stretch Road, in Merced, California, until approximately 9:11 a.m.  At that point, the Ford Explorer began traveling southbound on Interstate 5 again until it stopped in the area of 1284 West Palo Alto Avenue, Fresno, California.

35.    For the next 14 hours, the Ford Explorer made numerous stops at various addresses in the Fresno, California area.

36.    On November 6, 2018, at approximately 1:02 a.m., the Ford Explorer began traveling northbound on Interstate 5.  The GPS tracker indicated that Ford Explorer maintained a constant northbound route on Interstate 5, with intermittent stops at various rest areas, throughout the day of November 6, 2018.  At approximately 3:08 p.m., the Ford Explorer returned to the **TARGET RESIDENCE**.

37.    After the trip took place, CD2 advised investigators that CRUZ's trip was likely a social trip. CD2 reiterated that CRUZ still had several pounds of narcotics left to sell, that CRUZ had just recently purchased some more firearms, and that CRUZ had sold the two firearms to his friends down in Fresno, California during the trip.

38.    Investigators later confirmed that CRUZ purchased two firearms from West Coast Armory in Bellevue, Washington, on October 26, 2018, approximately nine days before he left for California.

**CRUZ's Trip to California in the Ford Explorer (November 29 to December 3, 2018) and Seizure of 6.28 Kilograms of Heroin**

39.     On November 29, 2018, CD2 informed TFO Eshom that CRUZ was planning to travel to California that day to pick up another load of narcotics.  Specifically, CD2 advised investigators that CRUZ was expecting to pick up approximately 20 kilograms of methamphetamine and approximately 10 kilograms of heroin on this trip.  CD2 also advised investigators that CRUZ's return trip to the Seattle, Washington area might be somewhat delayed because he would be staying in the Los Angeles, California area over the weekend to attend a boxing match.

40.     Utilizing the federally authorized GPS tracker on the Ford Explorer, investigators observed the black Ford Explorer travel southbound toward California at approximately 10:44 p.m. on November 29, 2018.  Monitoring the GPS tracker and the black Ford Explorer's activity, the black Ford Explorer maintained a constant southbound route of travel into November 30, 2018.  When it arrived in California, the black Ford Explorer made short stops in Fresno and the Hollywood area of Los Angeles before stopping at 10907 Weaver Avenue in South El Monte, California.  The Ford Explorer traveled to the area of Highland, California for some time and then to the downtown area of Los Angeles, California, where it stayed until December 2, 2018.[1]

41.     On December 1, 2018, in anticipation of the Ford Explorer traveling from southern California to Washington with a load of narcotics, SA Parker sought and obtained a federal search warrant for the black Ford Explorer.

42.     On December 2, 2018, at approximately 11:05 a.m., the Ford Explorer began traveling northbound on Interstate 5 toward Washington.  The GPS tracker indicated that the Ford Explorer maintained a constant northbound route on Interstate 5, with intermittent

---

[1] Investigators confirmed that there was a professional boxing match in Los Angeles, California, on the evening of December 1, 2018.

AFFIDAVIT OF SA PARKER - 9
USAO #2018R01135

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  stops at various rest areas, throughout the evening of December 2, 2018 and into the early

2  morning of December 3, 2018.

3      43.    On December 3, 2018, at approximately 4:19 a.m., investigators successfully

4  interdicted the black Ford Explorer by performing a traffic stop on Interstate 5 near Federal

5  Way, Washington.  CRUZ was driving the black Ford Explorer and had three passengers

6  in the vehicle.  After identifying CRUZ's passengers as Jader COLIMA-CRUZ, Gamaliel

7  CRUZ (G. CRUZ) and Griselda NATARENO-OCHOA, all four vehicle occupants were

8  allowed to leave the area.[2]  The black Ford Explorer was moved off-site to Federal Way

9  Police Department Evidence Unit where the search warrant could be executed in a safe and

10  methodical manner.

11      44.    During the execution of the search warrant of the black Ford Explorer, SA

12  Kevin Wetteland located a black Nike duffle bag in the back cabin area behind the rear row

13  of seats.  The duffle bag contained a white Target grocery bag tied at the top.  Inside the

14  white Target bag were five separate, brick-sized, saran-wrapped packages that were

15  consistent with packaging/material associated with the transportation of narcotics.  Four of

16  the five packages appeared to be similar in size, shape, and packaging (black carbon fiber

17  paper wrapped in saran wrap), while the fifth package was wrapped in green and brown

18  saran wrap and appeared to have two "bricks" combined into one package.

19      45.    These packages were submitted to the DEA Western Laboratory for analysis.

20  The laboratory confirmed that the saran-wrapped packages contained a total of 6,280 grams

21  of heroin.

22  **Surveillance of CRUZ in Summer 2019**

23      46.    Ranging from January 2019 to August 2019, investigators focused on

24  physical and electronic surveillance of the CRUZ DTO as well as gathering intelligence on

25

26  _____

27  [2] Jader COLIMA-CRUZ and Gamaliel CRUZ (G. CRUZ) are believed to be C. CRUZ's
   brothers. Griselda NATARENO-OCHOA is believed to be C. CRUZ's girlfriend and they now

28  have a child in common together.

1  CRUZ and his associates. This effort included utilizing phone pings on CRUZ's cell phone

2  (206-226-4384) and a GPS tracker being installed on CRUZ's black Ford Explorer.

3      47.    During the period in which CRUZ's cell phone and Ford Explorer were being

4  tracked, to the best of the investigators' knowledge, CRUZ did not travel to California.

5  Further, during the periods of physical and electronic surveillance, investigators observed

6  activity consistent with drug trafficking, such as frequent late night trips throughout the

7  Puget Sound region, conducting "heat checks" to avoid surveillance, and heavy foot traffic

8  to and from CRUZ's residence, but could not otherwise confirm that CRUZ was

9  conducting drug transactions.

10  **CRUZ's Traffic Stop in Lewis County, Washington on June 25, 2020**

11      48.    On June 25, 2020, working in conjunction with Joint Narcotics Enforcement

12  Team (JNET), investigators established surveillance on CRUZ at the **TARGET**

13  **RESIDENCE**.  Throughout this investigation, investigators have utilized physical and

14  electronic surveillance and have observed CRUZ coming and going from the **TARGET**

15  **RESIDENCE**.

16      49.    Two confidential sources (JNET CS1 and JNET CS2) working with JNET

17  provided information to JNET investigators that CRUZ was planning to travel southbound

18  from Seattle, Washington to Los Angeles, California in a rental car with a large sum of

19  United States currency (upwards of $150,000) and a cache of firearms.

20      50.    JNET CS1 was arrested by members of JNET and DEA in 2019. JNET CS1

21  had drug and gun charges pending against him/her. JNET CS1 agreed to cooperate with

22  law enforcement, with permission of the Lewis County Superior Court, in exchange for

23  favorable consideration in his/her drug and gun case. JNET CS2 was arrested in 2014 in

24  Oregon and subsequently convicted of a federal drug distribution charge. JNET CS2 is not

25  a U.S. citizen and was working with JNET for both monetary benefits and immigration

26  considerations.

27      51.    At approximately 7:45 a.m., SA Parker observed a newer model silver Lexus

28  IS250 with an obstructed temporary tag pull out of the driveway of the **TARGET**

**RESIDENCE** and leave northbound on 22nd Place South.  SA Parker observed a female driving the silver Lexus and a male in the passenger seat.  SA Parker believed the subjects to be Griselda NATARENO-OCHOA and CRUZ, but was unable to confirm this.  Due to limited surveillance assets at the time, SA Parker broke away from mobile surveillance on the silver Lexus and returned to the **TARGET RESIDENCE**.

52.   Approximately 30 minutes after breaking away from surveillance on the silver Lexus, SA Parker traveled southbound on 22nd Place South, past the **TARGET RESIDENCE**, and observed CRUZ in the driver's seat of the black Ford Explorer.  The black Ford Explorer was backed into the driveway of the residence so the front end was facing the street. It appeared that NATARENO-OCHOA was sitting in the passenger seat of the black Ford Explorer, but SA Parker was unable to confirm who the passenger was. As SA Parker drove southbound on 22nd Place South, the black Ford Explorer pulled out of the driveway and continued northbound on 22nd Place South.

53.   At approximately 9:06 a.m., SA Parker observed a white 2020 Hyundai Elantra bearing Washington license plate BQW2554 back up into the front driveway of the **TARGET RESIDENCE**.  SA Parker observed CRUZ get out of the driver's seat of the white Hyundai and enter the **TARGET RESIDENCE**.  Shortly after, SA Parker observed CRUZ walk out of the **TARGET RESIDENCE** with a large white bag. CRUZ placed the bag into the trunk of the white Hyundai. CRUZ got into the vehicle by himself.

54.   CRUZ was then observed traveling southbound 22nd Place South to Roseberg Avenue South, and then eastbound on South 110th St.  CRUZ then traveled southbound on 26th Avenue South to South 116th Way, where he began traveling westbound.  CRUZ took South 116th Way until it turned into 24th Avenue South.  CRUZ then turned into a "No Thru Traffic" area on South 118th Street to continue westbound. CRUZ turned right out of the construction zone and traveled northbound on Military Road South from South 118th Street.  Investigators caught up to CRUZ and found him traveling northbound on Des Moines Memorial Drive South. CRUZ then drove northbound past 22nd Place South.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

55. CRUZ's movements from the **TARGET RESIDENCE** appeared to be indicative of an early "heat check" as he just made one large loop around his neighborhood instead of traveling directly northbound on 22nd Place South from the **TARGET RESIDENCE**. Additionally, committing traffic infractions and traveling through the construction zone would have been easier for CRUZ to observe any particular vehicles that were attempting to follow his exact movements. This type of counter-surveillance behavior is common in drug traffickers and individuals who want to thwart law enforcement surveillance.

56. CRUZ then drove to a location near 1417 South Henderson Street, Seattle, Washington, and picked up a subject later identified as Oscar TOPETE-TOVAR. After picking up TOPETE-TOVAR, the white Hyundai then committed to driving southbound on Interstate 5. Investigators followed the vehicle continuously maintaining constant visual surveillance of the white Hyundai until they were able to hand off the visual surveillance to members of JNET's investigative team.

57. JNET then initiated a traffic stop on the white Hyundai. After a narcotics canine alerted to the vehicle, DEA TFO Adam Haggerty applied for a state search warrant through Lewis County. CRUZ and TOPETE-TOVAR were detained at the scene. Once authorized, investigators searched the vehicle and located the large white bag in the trunk of the vehicle. Located within the large white bag, among clothing, was a large sum of United States currency, some of which was wrapped in green cellophane (4 blocks of cash bundles marked with the number "10"), and some of which was just rubber-banded together. Although CRUZ claimed that the clothing in the white bag was his, he denied ownership or knowledge of the United States currency in the white bag. TOPETE-TOVAR also denied knowledge of the United States currency in the large white bag.

58. An official count of the United States Currency revealed CRUZ had $124,861.00 in the white bag. A check of CRUZ's Washington State employment history indicates that he had worked for a food service contractor called Flying Food Group LLC from Q3/2015 to Q4/2017. Each quarter between Q3/2015 and Q4/2017 ranged from a

AFFIDAVIT OF SA PARKER - 13
USAO #2018R01135

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  gross income of $6,961.26 to $10,699.47. After Q4/2017 up until the date of this affidavit,
2  CRUZ does not have any income recorded in Washington State.

3       59.    No firearms were located within the white Hyundai. Investigators advised
4  CRUZ and TOPETE-TOVAR that they were going to seize the United States currency.
5  CRUZ and TOPETE-TOVAR were released from the scene and allowed to leave with the
6  vehicle.  Approximately one hour and 15 minutes later, CRUZ was observed pulling back
7  up to the **TARGET RESIDENCE** in the white Hyundai. SA Parker observed CRUZ exit
8  from the white Hyundai. Shortly after, SA Parker observed a silver Lexus IS250 pick
9  CRUZ up from the **TARGET RESIDENCE** and drive away northbound on 22nd Place
10  South.

11       60.    At approximately 2:04 p.m., SA Parker observed the silver Lexus IS250 pull
12  up in front of the **TARGET RESIDENCE**.  SA Parker could observe CRUZ in the front
13  passenger seat of the silver Lexus IS250. CRUZ appeared to be talking to the driver of the
14  silver Lexus IS250. CRUZ did not get out of the silver Lexus until approximately 2:31 p.m.
15  At that point, CRUZ walked directly to the white Hyundai and got into the driver's seat of
16  the vehicle. The silver Lexus and white Hyundai then left the **TARGET RESIDENCE**.

17  **<u>Recent Surveillance of CRUZ at the TARGET RESIDENCE</u>**

18       61.    Throughout the entire course of this investigation, CRUZ has been
19  observed frequently coming and going from his primary residence at 10626 22nd Pl S,
20  Seattle, Washington (**TARGET RESIDENCE**). CRUZ has been observed interacting
21  with known and unknown associates in the front driveway of **TARGET RESIDENCE**.
22  As of September 29, 2020, CRUZ has been observed going to/from the **TARGET**
23  **RESIDENCE** multiple times within the week and over the weekend. CRUZ appears to
24  generally be more active in the early afternoon and evening hours. During the week of
25  September 21, 2020, CRUZ had been seen utilizing a newer silver SUV with unknown
26  Washington license plates in addition to his 2018 black Ford Explorer.

27       62.    On September 29, 2020, JNET CS2 informed JNET investigators that
28  CRUZ said he was looking to pick up a load of narcotics.  JNET CS2 was unable provide

1    any further details regarding CRUZ's plans.  Based on the information gathered through
2    this investigation about CRUZ's drug trafficking activity, it is likely that CRUZ would
3    stockpile significant amounts of cash and/or firearms in preparation for obtaining a load
4    of narcotics.

5    **CRUZ's history of firearm purchases**

6        63.    CRUZ has no known criminal history and can lawfully purchase firearms
7    from federally licensed firearms dealers.

8        64.    During this investigation, ATF SA Jackson obtained CRUZ's firearm
9    purchase records from federally licensed firearm dealers in King and Pierce Counties.[3]

10       65.    These records showed that, between June 3, 2015, and October 26, 2018,
11   CRUZ purchased 26 firearms from six different federally licensed firearms dealers.

12       66.    Based on his training and experience in firearm investigations, SA Jackson
13   identified several aspects of CRUZ's firearm purchase history that suggested CRUZ had
14   illegally purchased firearms for other people (an act commonly referred to as a "straw
15   purchase").  In purchasing a firearm for someone else, a straw purchaser is violating federal
16   law because the Firearms Transaction Record /ATF Form 4473 requires the purchaser to
17   assert the he/or she is the actual purchaser of the firearm.[4]  If a purchaser indicates that the
18   firearm is intended for someone else, the dealer will not complete the sale.

19       67.    SA Jackson noted that several of the firearms that CRUZ purchased in
20   Washington were recovered in other people's possession, often in locations outside
21   Washington, and sometimes shortly after CRUZ purchased the firearm.

22
23
---
24   [3] Because there is no national database of firearm purchases, one of the only ways for agents to
25   obtain information about firearm purchases is to request firearm transaction records from each
26   federally licensed dealer.

27   [4] A person may purchase a firearm for another person as a bona fide gift, meaning that the
     recipient has not paid any consideration for the firearm.  A person can never lawfully gift a
28   firearm to a prohibited person, however.

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

68.     Specifically, SA Jackson reviewed records showing that the following firearms had been recovered in criminal investigations:

a.      A Colt rifle that CRUZ purchased on February 24, 2016, was recovered in Tijuana, Mexico on April 23, 2018.

b.      A Glock 19 9mm pistol that CRUZ purchased on June 13, 2016, was recovered in another person's possession in Seattle, Washington, on ███████████ 2017.  The Glock was located on ██████████████ person as ██████████ fled from the scene of a murder.  Once Seattle Police Department (SPD) Officers responded to the area of ████████████ ████████████████ in Seattle, due to hearing several gunshots coming from the area, they observed ████ males dressed in all black, flee from them on foot.  SPD Officers later caught one of the males who was identified as █████████████ Officers recovered a Glock 9mm from ██████████ hoodie pocket.  The Glock was determined to be originally purchased by CRUZ through a trace of the firearm. █████ ██████████████████████████████████████████████████████ Also located at the murder scene was a firearm that was originally purchased by CRUZ's brother, G. CRUZ.

c.      A Ruger 9mm pistol that CRUZ purchased on November 25, 2016, was recovered in another person's possession in Brentwood, California, on November 28, 2016.  The person who possessed the firearm three days after CRUZ's purchase was CRUZ's nephew.

d.      A Smith and Wesson .40 caliber pistol that CRUZ purchased on October 1, 2016, was recovered in another person's possession in Fresno, California, on November 6, 2016.

69.     SA Jackson is aware that a straw purchaser's firearm purchase history often has unusual characteristics, such as frequent purchases, cash only purchases, repeated purchases of the same or similar firearms, purchasing more than one firearm in a single transaction, and numerous purchases of types of firearms that are not rare or commonly

AFFIDAVIT OF SA PARKER - 16
USAO #2018R01135

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    collected.  These characteristics stem from the fact that a straw purchaser is not actually
2    purchasing the firearms for themselves or for a legitimate collection.

3        70.    Of the 26 firearms that CRUZ has purchased, several are of the same make
4    and model.  For example, he purchased a Colt M4 carbine rifle on June 3, 2015, and again
5    on April 8, 2017, and then purchased two Colt M4 carbine rifles during a single transaction
6    on December 22, 2017.  Additionally, CRUZ purchased a Glock 19, G4, 9mm caliber pistol
7    on June 13, 2016, and then purchased two more Glock 19, G4, 9mm caliber pistols during
8    a single transaction on March 22, 2018.  Neither a Colt M4 carbine rifle nor a Glock 19,
9    G4, 9mm pistol is considered rare or commonly collected.

10        71.    Based on SA Jackson's training and experience investigating numerous
11    firearms possession and trafficking offenses, he has also advised me of the following
12    common characteristics of firearms transactions.

13        72.    When individuals who are prohibited from legally possessing firearms seek
14    to acquire or dispose of firearms, they typically do so through private sales. A common
15    way in which these types of private firearm sales, also referred to as "street sales," are
16    transacted is via electronic communications such as text message, email, and/or telephone
17    calls. Cell phones are frequently used to arrange such transactions because of the flexibility
18    and mobility they offer.  When individuals are offering items of value for sale, such as
19    firearms, it is common for them to take a photograph of the item and send it via text
20    message or email to an interested party for their review, or to take a photograph of it to
21    post/advertise it via social media or the internet.  It is common for buyers' and sellers' cell
22    phones to contain photographs of the firearms that were bought or sold.

23        73.    Along with the firearm, certain items are also generally transferred to the
24    purchaser such as: register receipts, invoices, owner's manuals, warranty/ manufacturer
25    information, safety brochures, trigger locks, firearms boxes, magazines, firearms cleaning
26    equipment, and firearms accessories such as interchangeable grips or sights.

27        74.    Individuals who are prohibited from purchasing firearms may not take
28    possession of all the firearm-related items that are transferred to a straw purchaser and are

AFFIDAVIT OF SA PARKER - 17
USAO #2018R01135

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   evidence of the firearm possession and purchase.  Instead, these items and records likely
2   remain with the straw purchaser.

3        75.    A straw purchase is often accomplished in order to obtain a particular firearm
4   or firearms.  Obtaining a particular type of firearm would typically require the ineligible
5   person to communicate with the straw purchaser and would likely result in records of such
6   communication in the form of text messages, e-mails, phone logs, or written lists.

7        76.    A straw purchaser may also communicate with the ineligible person about
8   the date and time of the purchase, or to arrange payment.  These types of arrangements are
9   also likely to appear in text messages, notes, e-mails, phone logs, or written lists.

10  ### IV.    COMMON CHARACTERISTICS OF DRUG TRAFFICKING

11       77.    As a result of my training and experience, and based on my consultation with
12  other agents and law enforcement officers, I have an understanding of the manner in which
13  narcotics are distributed and the various roles played by individuals and groups in their
14  distribution. I have encountered and have become familiar with various tools, methods,
15  trends, paraphernalia, and related articles utilized by various traffickers in their efforts to
16  import, conceal, and distribute controlled substances. I am also familiar with the manner
17  in which drug traffickers use telephones, often cellular telephones, to conduct their
18  unlawful operations. I am also familiar with the manner in which drug traffickers will use
19  weapons to protect their drug activities and further its goals.

20       78.    Based upon my training, experience, and conversations with other
21  experienced officers and agents, I know that:

22       a.    Drug trafficking conspiracies usually take place over several months
23      or years, and continue to operate even when enforcement activity results in arrests
24      and/or seizures of drugs and/or money.

25       b.    Persons involved in the distribution of controlled substances typically
26      will obtain and distribute drugs on a regular basis, much as a distributor of a legal
27      commodity would purchase stock for sale. Similarly, such drug dealers will

28

Affidavit of SA Parker - 18
USAO #2018R01135

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

maintain an "inventory," which will fluctuate in size depending upon the demand for and the available supply of the product.

c.     It is common for drug dealers to possess narcotics, drug paraphernalia, and other items which are associated with the sale and use of controlled substances such as scales, containers, cutting agents/substances, and packaging materials in their residences, stash houses, storage units, garages, outbuildings and/or vehicles on their property.

d.     Drug traffickers often document aspects of their criminal conduct through photographs or videos of themselves, their associates, their property, and their product. Drug traffickers usually maintain these photographs or videos in their possession.

e.     It is a common practice for drug traffickers to maintain records relating to their drug trafficking activities in their residences, stash houses, storage units, garages, outbuildings and/or vehicles. Because drug traffickers in many instances will "front" (i.e., sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" these items from their suppliers, such record keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. These records include "pay and owe" records to show balances due for drugs sold in the past (pay) and for payments expected (owe) as to the trafficker's suppliers and distributors, telephone and address listings of clients and suppliers, and records of drug proceeds. These records are commonly kept for an extended period of time.

f.     Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation and distribution of controlled substances. These documents, whether in physical or electronic form, are maintained where the traffickers have ready access to them. These documents include travel records, receipts, airline tickets, auto rental

agreements, invoices, and other memorandum disclosing acquisition of assets and personal or business expenses. I also know that such records are frequently maintained in narcotics traffickers' residences, stash houses, storage units, garages, outbuildings and/or vehicles.

g.     Drug traffickers often maintain large amounts of US currency in order to maintain and finance their ongoing illegal drug trafficking business.

h.     It is common for drug dealers to secret drugs, currency and other valuable items representing the proceeds of drug sales in secure locations within their residences, stash houses, storage units, garages, outbuildings and/or vehicles on the property in order to prevent the theft of such items by other persons or the seizure of such items by law enforcement. These secure locations typically include other residences also known as "stash houses," storage lockers, safes, portable safes, vaults, or other locked containers (sometimes requiring passwords or codes to open), as well as specially constructed concealed compartments such as those often found in "load cars" used specifically to facilitate drug trafficking.

i.     It is common to find papers, letters, billings, documents, and other writings, which show ownership, dominion, and control of businesses, residences, and/or vehicles in the residences, stash houses, storage units, garages, outbuildings and/or vehicles of drug traffickers. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises also include canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, keys, financial papers, rental receipts and property ownership papers, personal and business telephone and address books and telephone toll records, and other personal papers or identification cards in the names of subjects involved in the criminal activity being investigated.

j.     Drug traffickers commonly have in their possession, that is, on their person, at their residences, stash houses, storage units, garages, outbuildings and/or

vehicles, firearms, ammunition, and other weapons, which are used to protect and secure their property. Persons who purchase and possess firearms also tend to maintain the firearms and ammunition for lengthy periods of time. Firearms can be acquired both legally and unlawfully, without official / traceable documentation. Persons who acquire firearms from Federal Firearms Licensees, through deliberated fraud and concealment, often will also acquire firearms from private parties and other sources unknown to ATF. Firearms or ammunition are often secreted at other locations within their residential curtilage, and the identification of these firearms will assist in establishing their origins. Persons who purchase, possess, sell and/or trade firearms or ammunition commonly maintain documents and items that are related to the purchase, ownership, possession, sale and/or transfer of firearms, ammunition, and/or firearm parts, including but not limited to driver's licenses, telephone records, telephone bills, address and telephone books, canceled checks, receipts, bank records and other financial documentation on the owner's person, at the owner's residence, or in vehicles that they own, use, or have access to.

k.      Drug traffickers use mobile electronic devices including cellular telephones and other wireless communication devices in connection with their illegal activities in order to set up meetings with coconspirators, conduct drug transactions, or to arrange for the transportation drugs or drug proceeds. As described below, such equipment often contains evidence of these illegal activities.

l.      Traffickers of controlled substances commonly maintain addresses, vehicles, or telephone numbers which reflect names, addresses, vehicles, and/or telephone numbers of their suppliers, customers, and associates in the trafficking organization, and it is common to find drug traffickers keeping records of said associates in cellular telephones and other electronic devices. Traffickers often maintain cellular telephones for ready access to their clientele and to maintain their ongoing narcotics business. Traffickers frequently change their cellular telephone

AFFIDAVIT OF SA PARKER - 21
USAO #2018R01135

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

numbers to avoid detection by law enforcement, and it is common for traffickers to use more than one cellular telephone at any one time.

m.    Drug dealers use cellular telephones as a tool or instrumentality in committing their criminal activity. They use them to maintain contact with their suppliers, distributors, and customers. They prefer cellular telephones because, first, they can be purchased without the location and personal information that land lines require. Second, they can be easily carried to permit the user maximum flexibility in meeting associates, avoiding police surveillance, and traveling to obtain or distribute drugs. Third, they can be passed between members of a drug conspiracy to allow substitution when one member leaves the area temporarily. Since cellular phone use became widespread, many drug dealers I have contacted have used one or more cellular telephones for his or her drug business. I also know that it is common for drug traffickers to retain in their possession phones that they previously used, but have discontinued actively using, for their drug trafficking business. Based on my training and experience, the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or crimes. This includes the following:

    i.    The assigned number to the cellular telephone (known as the mobile directory number or MDN), and the identifying telephone serial number (Electronic Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are important evidence because they reveal the service provider, allow us to obtain subscriber information, and uniquely identify the telephone. This information can be used to obtain toll records, to identify contacts by this telephone with other cellular telephones used by co-conspirators, to identify other telephones used by the same subscriber or purchased as part of a package, and to confirm if the telephone was contacted by a cooperating source.

AFFIDAVIT OF SA PARKER - 22
USAO #2018R01135

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

ii.    The stored list of recent received, missed, and sent calls is important evidence. It identifies telephones recently in contact with the telephone user. This is valuable information in a drug investigation because it will identify telephones used by other members of the organization, such as suppliers, distributors and customers, and it confirms the date and time of contacts. If the user is under surveillance, it identifies what number he called during or around the time of a drug transaction or surveilled meeting. Even if a contact involves a telephone user not part of the conspiracy, the information is helpful (and thus is evidence) because it leads to friends and associates of the user who can identify the user, help locate the user, and provide information about the user. Identifying a defendant's law-abiding friends is often just as useful as identifying his drug-trafficking associates. The information is also valuable in the firearms context because it will identify telephones used by other individuals who are part of illegal firearms transactions, and confirm the date and time of contacts.

iii.    Stored text messages are important evidence, similar to stored numbers. Agents can identify both drug associates, and friends of the user who likely have helpful information about the user, his location, and his activities.

iv.    Photographs on a cellular telephone are evidence because they help identify the user, either through his or her own picture, or through pictures of friends, family, and associates that can identify the user. Pictures also identify associates likely to be members of the drug trafficking organization. Some drug dealers photograph groups of associates, sometimes posing with weapons and showing identifiable gang signs. Also, digital photos often have embedded "geocode" or

AFFIDAVIT OF SA PARKER - 23
USAO #2018R01135

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

GPS information embedded in them. Geocode information is typically the longitude and latitude where the photo was taken. Showing where the photo was taken can have evidentiary value. This location information is helpful because, for example, it can show where coconspirators meet, where they travel, and where assets might be located.

v. Based on my training and experience in investigating numerous firearms possession and trafficking offenses, I am aware that when individuals who are prohibited from legally possessing firearms seek to acquire firearms, they typically seek to obtain the firearms from private sellers. A common way in which these types of private firearm sales, also referred to as "street sales," are transacted is via electronic communications such as text message, email, and/or telephone calls. I know that cell phones are frequently used to arrange such transactions because of the flexibility and mobility they offer. I am further aware that when individuals are offering items of value for sale, such as firearms, it is common for them to take a photograph of the item and send it via text message or email to an interested party for their review, or to take a photograph of it to post/advertise it via social media or the internet. During numerous investigations of firearms sales, I have found it to be common for buyer's or seller's cell phones to contain photographs of the firearms that were bought or sold.

vi. Stored address records are important evidence because they show the user's close associates and family members, and they contain names and nicknames connected to phone numbers that can be used to identify suspects.

//

AFFIDAVIT OF SA PARKER - 24
USAO #2018R01135

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## V.  CONCLUSION

79.    Based on investigation to date, summarized above, there is probable cause to conclude that Cesar CRUZ is engaged in drug trafficking offenses, specifically, distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and firearm offenses, specifically possessing firearms in furtherance of drug trafficking crimes, in violation of Title 18, United States Code, Section 924(c), and Making a False Statement in Connection with the Acquisition of a Firearm, in violation of Title 18, United States Code, Section 922(a)(6).  There is also probable cause to conclude that the evidence, fruits, and instrumentalities of these offenses, as set forth in Attachment B, will be found at CRUZ's home, the **TARGET RESIDENCE**, described in Attachment A.

JOSEPH M. PARKER
Special Agent
Drug Enforcement Administration


The above-named agent provided a sworn statement attesting to the truth of the contents of the foregoing affidavit on the 1st day of October, 2020.

PAULA L. MCCANDLIS
United States Magistrate Judge

**ATTACHMENT A**

**PREMISES TO BE SEARCHED**

The premises to be searched (the "TARGET RESIDENCE") is a property located at 10626 22nd Place South, Seattle, Washington on the east side of the street.  The property is identified through the King County Department of Assessments as Parcel 042304-9072, and includes a multi-story, single-family brick house with the numbers "10626."

The search is to include all rooms, vehicles, garages, and outbuildings located on the property and any digital devices or electronic storage media found therein, provided, however, that if law enforcement can reasonably determine that the CESAR CRUZ neither owns nor has access to a particular digital device, this warrant DOES NOT authorize its seizure or search.

**ATTACHMENT B**

**ITEMS TO BE SEARCHED FOR AND SEIZED**

From the premises to be searched, which is identified in Attachment A of this warrant, the government is authorized to search for and seize the following items, which are evidence, instrumentalities, and/or fruits of the commission of the following crimes: distribution and possession with intent to distribute controlled substances in violation of Title 21, United States Code, Sections 841(a)(1), possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c), and making a false statement in connection with the acquisition of a firearm, in violation of Title 18, United States Code, Section 922(a)(6):

1.     Controlled substances, for example, heroin and methamphetamine;

2.     Paraphernalia for packaging, smuggling, processing, diluting, manufacturing, weighing, and distributing controlled substances, for example: hidden compartments, scales, blenders, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluting agents such as inositol, vitamin B12, etc.;

3.     Firearms and firearms related items, including magazines, ammunition, holsters, and body armor, or other dangerous weapons;

4.     Records, in whatever form, relating to the acquisition, transportation, and distribution of controlled substances, or the purchase and sale of firearms and ammunition, such as ledgers, receipts, notes, owner's manuals, and similar items;

5.     Records, in whatever form, identifying drug customers and drug suppliers, such as, telephone records, personal address books, correspondence, diaries, calendars, notes with phone numbers and names, "pay/owe sheets" with drug amounts and prices, and similar items;

6.     Currency and financial records, in whatever form, that show income from, or activity related to, drug trafficking, including bank records, money transfer records, safe deposit box records and keys, credit card records, bills, receipts, tax returns, vehicle documents, and similar items; and other records that show income and expenditures, net worth including receipts for personal property, negotiable instruments, bank drafts, cashier's checks, and similar items;

7.     Photographs, video tapes, digital cameras, and similar items depicting the property occupants, suspected buyers or sellers of controlled substances or firearms, firearms,

controlled substances, drug distribution paraphernalia, and assets derived from the distribution of controlled substances;

8.      Deeds, contracts, escrow documents, mortgage documents, rental documents, and other evidence relating to the purchase, ownership, rental, or control of the premises, and similar records of other property owned or rented by the occupants that is evidence of income from drug trafficking and locations of drugs and money;

9.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises and/or vehicle, including canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

10.     Identification documents, including passports, visas, alien registration cards, any and all travel documents, immigration documents, driver's licenses, identification cards, and social security cards;

11.     Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries; airline schedules; gas receipts, bills; charge card receipts; hotel, motel, and car rental statements; correspondence with travel agencies and other travel related businesses; airline, rent a car, and hotel frequent flier or user cards and statements; passports and visas; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel; and

12.     Cellular telephones and other communications devices including Blackberries, Androids, iPhones, and similar devices, specifically including a cellular phone with the phone number (206) 226-4384.   With respect to these communication devices only, the following restrictions apply:

Investigating agents are authorized to search seized telephones for:

- assigned numbers (mobile directory numbers or MDN), and identifying serial numbers, such as Electronic Serial Numbers (ESN), International Mobile Subscriber Identity (IMSI), or International Mobile Equipment Identity (IMEI) numbers;

- stored lists of telephone calls sent, missed, and received;

- stored contact information;

- photographs and videos related to federal criminal violations of Title 21, United States Code, Sections 841(a), and Title 18,

Attachment B
USAO 2018R01135

United States Code, Sections 924(c) and 922(a)(6), including any embedded GPS data associated with these photographs and videos;

- photographs and videos that may show the user of the phone and/or co-conspirators, including any embedded GPS data associated with these photographs and videos;

- stored text, chat, and other electronic messages (sent, received, and drafted) related to federal criminal violations of Title 21, United States Code, Sections 841(a), and Title 18, United States Code, Section 924(c) and 922(a)(6), including Apple iMessages, Snapchat messages, Facebook messages, or other similar messaging services where the data is stored on the telephone; and stored text messages that may show the user of the phone.